UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| | * | CIVIL ACTION |
| WILLIAM G. ARMINGTON, M.D. | * | NO. 09-6785 |
| | * | |
| VERSUS | * | SECTION "F" |
| | * | HON. MARTIN L.C. FELDMAN |
| SHERI FINK, M.D.; PROPUBLICA, INC. | * | |
| and THE NEW YORK TIMES COMPANY | * | |
| | * | MAG. JUDGE "3" |
| | * | HON. DANIEL E. KNOWLES, III |
| | * | |

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

**<u>MEMORANDUM IN SUPPORT OF SPECIAL MOTION TO STRIKE</u>**

**MAY IT PLEASE THE COURT:**

Defendants Sheri Fink, M.D., ProPublica,[1] and The New York Times Company

(collectively, the Defendants) respectfully submit this memorandum in support of their special

motion to strike.

---

[1] ProPublica does business under that name; its legal name is Pro Publica, Inc.; it is a Delaware nonprofit corporation. It is erroneously named in plaintiff's papers as Propublica, Inc.

1

## INTRODUCTION

Plaintiff William G. Armington, M.D. (Dr. Armington) filed the underlying action against the Defendants, alleging that they defamed him and cast him in a false light. At the heart of the action is an article titled "Strained by Katrina, a Hospital Faced Deadly Choices," written by Dr. Sheri Fink, an employee of ProPublica, and published in The New York Times Magazine and online at nytimes.com and propublica.org in August 2009.[2] As its title portends, the article recounts and examines doctors' responses to the crises patients and medical staff faced at Memorial Medical Center in the days after Hurricane Katrina, including the decision made by certain doctors to administer large doses of morphine to patients.

Dr. Armington was among the medical staff that attended to and assisted in the evacuation of Memorial patients in the days after Hurricane Katrina. When he learned that Dr. Fink was writing an article on the difficulties medical staff there faced, he agreed to discuss with her his own experiences. Fink Aff. ¶ 6. Dr. Fink interviewed Dr. Armington via telephone on two occasions. *Id.* ¶ 7. During both interviews, Dr. Fink documented their conversations by contemporaneously typing detailed notes on her computer. *Id.*

In addition to Dr. Armington, Dr. Fink interviewed many other individuals, including several other doctors who were also at Memorial in the days after Hurricane Katrina, to research the events that are recounted in the article. *Id.* ¶ 10. The resulting 20+-page magazine article focuses heavily on Dr. Anna Pou, though other individuals—including Drs. John Thiele and Ewing Cook, nurses Susan Mulderick and Diane Robichaux, and Coroner Frank Minyard— feature prominently in the article. *See* Ex. A to Fink Aff.

---

[2] The headline "Strained by Katrina" is the one that is used for the article on nytimes.com, where it was first published, and on the home page of propublica.org. The print edition of The New York Times and the article web page on propublica.org use the headline "Deadly Choices at Memorial."

By contrast, Dr. Armington is not featured prominently in the article.  He is mentioned briefly, and only twice.  *Id.*; *see infra* Part I.A.  Furthermore, the article neither states nor implies that Dr. Armington administered large doses of morphine to patients or participated in the decision to do so.  Nevertheless, Dr. Armington's complaint alleges that the article "unequivocally conveys that Dr. Armington was a knowing and willing accomplice to euthanasia," Compl. ¶ 62, and therefore defamed him and cast him in a false light.

The Defendants resolutely deny that the article either defamed Dr. Armington or cast him in a false light.  The article does not convey the defamatory meaning Dr. Armington subjectively assigns to it.  Furthermore, and as importantly, the evidence, in the form of notes taken by Dr. Fink and The New York Times's fact-checker, confirms that the article's statements concerning Dr. Armington are true.

The Defendants therefore ask that this Court dismiss Dr. Armington's action pursuant to Louisiana Code of Civil Procedure article 971, Louisiana's "anti-SLAPP"[3] statute.  Article 971 provides a procedure allowing a defendant to file a special motion to strike, or dismiss, claims arising from the defendant's exercise of First Amendment rights.[4]  The purpose of article 971 is "to free defendants from the burden and expense of litigation that has the purpose or effect of chilling the exercise of First Amendment rights." *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164, 178 (5th Cir. 2009).  To survive a special motion to strike, a plaintiff has the "difficult burden" to demonstrate a probability of success on his claim; he "must produce evidence of sufficient quality and quantity to demonstrate that he will be able to meet his burden

---

[3] SLAPP is an acronym meaning "strategic lawsuit against public participation."  Anti-SLAPP statutes like article 971 reflect a widespread concern among state legislatures that lawsuits, such as the underlying action, can have the purpose or effect of chilling the exercise of First Amendment rights.  In response to a growth in these kinds of lawsuits, commonly called SLAPPs, state legislatures enacted statutes to provide for the early dismissal of non-meritorious claims. *See generally Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164 (5th Cir. 2009).

[4] Article 971 applies in this diversity case.  *See* discussion *infra* Part II.

of proof at trial." *Id.* at 181 (quoting *Estiverne v. Times-Picayune, L.L.C.*, 950 So.2d 858, 860 (La. App. 4th Cir. 2006)).

This memorandum will show that Dr. Armington cannot carry that burden.  Below the Defendants offer an overview of, first, the article itself and, second, Dr. Armington's complaint. (Part I.)  The Defendants then discuss article 971 and the law applicable to special motions to strike brought under article 971.   (Part II.)   Finally, the Defendants demonstrate that Dr. Armington cannot meet his burden under article 971 on either his defamation or false light claims, particularly in the light of very strong evidence supporting the article's truthfulness. (Parts III and IV.)   Accordingly, the Defendants submit that Dr. Armington's action must be dismissed and Dr. Armington must pay the Defendants' reasonable attorneys fees and costs.  LA. CODE CIV. PROC. art. 971(B) ("a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs").

<u>**DISCUSSION**</u>

**I.      The article and the complaint**

**A. The article**

As stated above, the 20+-page article that is the subject of this action—"Strained by Katrina, a Hospital Faced Deadly Choices"—recounts and examines doctors' responses to the crises patients and medical staff faced at Memorial Medical Center in New Orleans in the days after Hurricane Katrina.  *See* Ex. A to Fink Aff.  It is fair to say that the article is intended to spark thought and debate about whether certain doctors' responses, as recounted by the medical

staff themselves, were ethical, even under the extraordinarily difficult circumstances they faced. There is, of course, nothing actionable about that.[5]

The article was reported by Dr. Fink over a period of more than two years, including 16 months while on the full-time staff of ProPublica. Fink Aff. ¶ 11. ProPublica, a non-profit investigative news organization established in 2007-2008 in response to the business crisis in journalism,[6] offered the article exclusively and without charge to The New York Times, which decided, after its usual careful editing and fact-checking, to publish the article in its Sunday Magazine section.[7] It did so on August 30, 2009. The article was first available online, through nytimes.com and propublica.org, on August 27, 2009.

At 20+ pages of text, the article is long even by magazine standards. The article was extensively researched by Dr. Fink, and carefully fact-checked by The New York Times's own fact-checkers. *See generally* Fink Aff. & Wilson Aff. As noted above, while the article focuses heavily on Dr. Anna Pou, other individuals—including Drs. John Thiele and Ewing Cook, nurses Susan Mulderick and Diane Robichaux, and Coroner Frank Minyard—feature prominently in the

---

[5] First Amendment precedent emphasizes "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). That commitment to debate extends to public issues involving both public and private figures. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986) (in the light of "need to encourage debate on public issues," even a private-figure plaintiff must, in a suit against a media defendant, prove falsity and fault); *see also Kennedy v. Sheriff of East Baton Rouge*, 935 So.2d 669, 676 (La. 2006) (same).

[6] ProPublica is led by Paul Steiger, the former managing editor of The Wall Street Journal, and Stephen Engelberg, a former managing editor of The Oregonian and the former investigative editor of The New York Times. ProPublica has a full-time news staff of 32, making it the largest investigative news operation in the U.S. today. A nonprofit supported entirely by philanthropy, it offers its leading articles free of charge and on an exclusive basis to leading news organizations. These have ranged from The New York Times to the New Orleans Times-Picayune, from BusinessWeek to Politico, from Reader's Digest to 60 Minutes. Since it began publishing in June 2008, ProPublica has published some 200 such articles with 47 different partners; six of these articles have appeared in the Times, of which the article at issue here was the fourth.

[7] The New York Times estimates that approximately 4,000-5,000 print copies of its Sunday edition, including its Sunday Magazine, are circulated in Louisiana each week.

article.  Ex. A to Fink Aff.  Dr. Armington, by contrast, does *not* feature prominently in the article.

Indeed, in the article's 20+ pages of text, Dr. Armington is mentioned only *twice*.  *Id.*  Those mentions are as follows:

Excerpt (1):

[Deichmann] said that patients with D.N.R. orders had terminal or irreversible conditions, and at Memorial he believed they should go last because they would have had the "least to lose" compared with other patients if calamity struck. Other doctors at the meeting agreed with Deichmann's plan.  Bill Armington, a neuroradiologist, told me he thought that patients who did not wish their lives to be prolonged by extraordinary measures wouldn't want to be saved at the expense of others—though there was nothing in the orders that stated this.  At the time, those attending the meeting didn't see it as a momentous decision, since rescuers were expected to evacuate everyone in the hospital within a few hours.[8]

Excerpt (2):

Bill Armington, the neuroradiologist, watched King go and was upset at him for leaving.  Armington suspected that euthanasia might occur, in part, he told me, because Cook told him earlier that there had been a discussion of "things that only doctors talk about."  Armington headed for the helipad, "stirred up," as he recalls, "to intensify my efforts to get people off the roof."  Neither Armington nor King intervened directly, though King had earlier sent out text messages to friends and family asking them to tell the media that doctors were discussing giving medication to dying patients to help accelerate their deaths.[9]

**B. The complaint**

Dr. Armington's complaint sets forth many allegations, all variations of the same theme—that the article "unequivocally conveys that Dr. Armington was a knowing and willing accomplice to euthanasia." Compl. ¶ 62.  The complaint also voices several criticisms of the

---

[8] For ease of reference, this passage has been marked in the copy of the article attached to the Affidavit of Sheri Fink.  *See* Ex. A to Fink Aff.

[9] For ease of reference, this passage has been marked in the copy of the article attached to the Affidavit of Sheri Fink.  *See* Ex. A to Fink Aff.

6

article that simply are not relevant to Dr. Armington's claims.   The Defendants will briefly address those criticisms before addressing the complaint's substantive allegations.

Chief among Dr. Armington's general criticisms is that the article does not, in Dr. Armington's opinion, offer a fresh point of view.  Dr. Armington asserts that the subject has been "investigated fully by prosecutors, coroners, scholars, authors and reporters"; Dr. Fink's approach, he complains, is not novel.  *See id.* ¶ 38-44.  Dr. Armington claims that he agreed to be interviewed by Dr. Fink only because he was told the article would be about "physicians in crisis" and would be "for use by health care providers in crisis situations."  *Id.* ¶ 43. Dr. Armington also complains that the resulting article did not—at least in his view— "truthfully and accurately present[] Dr. Armington as a physician who voluntarily placed himself in harm's way to aid and, if needed, rescue patients."  *Id.* ¶ 57.  Finally, Dr. Armington protests that the article was published for profit.  *Id.* ¶ 81.

First, and respectfully, Dr. Fink was under no obligation to depict Dr. Armington as a hero.   It is nevertheless worth noting that the article *does* leave the impression that Dr. Armington's efforts were heroic.  In excerpt (2), above, the article recounts that Dr. Armington was "'stirred up,' as he recalls, 'to intensify my efforts to get people off the roof.'"   Of note, Dr. Armington's complaint, which partially reproduces this excerpt, omits the first three sentences from excerpt (2), above, with the effect of ignoring these comments and taking out of context the subsequent text "Neither Armington nor King intervened directly."  *See id.* ¶ 61.

Second, virtually all news media operates for profit, though it bears mention that ProPublica is a non-profit organization, it bore most of the expense of producing this article, and it received no revenue from it.  In any event, there is *no* authority for Dr. Armington's allegation at paragraph 81 of his complaint that "The defendants' motives in writing and propagating the

7

false allegations against Dr. Armington are economic; therefore, this commercial speech does not qualify for the heightened protections of the First Amendment."  *See* Compl. ¶ 81.  To the contrary, the Supreme Court has squarely rejected it.  *See Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 67 (1983) ("an economic motivation ... would clearly be insufficient by itself to turn the materials [in question] into commercial speech"); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."); *see also New Kids on the Block v. News America Publishing, Inc*., 745 F.Supp. 1540, 1544 (C.D.Cal. 1990) ("A profit motive ... is irrelevant to the inquiry of whether the content of ... speech ... is ... commercial [or otherwise]").  In sum, there is no support for Dr. Armington's suggestion that the article is not entitled the fullest protections afforded by the First Amendment.

Finally, Dr. Armington's subjective criticisms of the article are not relevant to his defamation and false-light claims, as they do not tend to show that the portions of the article "of and concerning" Dr. Armington are either defamatory or false.  *Gugliuzza v. K.C.M.C., Inc.*, 606 So.2d 790, 791-92 (La. 1992) (only words "of and concerning" the plaintiff are actionable).

Having addressed those criticisms, the Defendants turn to the substantive allegations of the complaint. The gravamen of Dr. Armington's complaint is that the article conveys that he was an accomplice to euthanasia.  Specifically, the complaint alleges that:

- "the defendants have falsely implicated Dr. Armington as one of the medical professionals '. . . involved in the decision to inject patients . . .'" (¶ 54)

- "the defendants have intentionally woven him (and potentially others) with physicians who allegedly knew of and committed euthanasia" (¶ 57)

- the defendants "unmistakably presented Dr. Armington as one of Dr. Pou's 'colleagues' despite knowing he was uninvolved with any acts of decisions relating to euthanasia" (¶ 59)

8

300566v.1

- the article "repeatedly implies and asserts that Dr. Armington's knowledge and support of euthanasia" (¶ 61)

- the article "unequivocally conveys that Dr. Armington was a knowing and willing accomplice to euthanasia" (¶ 62)

- the defendants "created and refused to correct the false and damaging implication that Dr. Armington was professionally ethically and morally derelict in not 'intervening' to save these patients who were allegedly being euthanized" (¶ 65)

Respectfully, these allegations *grossly* misrepresent the article and the substance of Dr. Armington's appearances in it.  Quite contrary to the complaint's allegations, the article's two brief mentions of Dr. Armington in more than 20 pages of text do *not* "unequivocally convey[] that Dr. Armington was a knowing and willing accomplice to euthanasia."  *Nothing* in the two brief mentions suggests that Dr. Armington was involved in any decision to euthanize patients. To the extent that Dr. Armington's defamation claim depends on allegations that plainly misrepresent the contents of the article, it necessarily fails.

The article does state, in excerpt (2): "Armington suspected that euthanasia might occur, in part, he told me, because Cook told him earlier that there had been a discussion of 'things that only doctors talk about.'"   Ex. A to Fink Aff.  That sentence, however, is immediately followed by the explanation that Armington felt "stirred up" and motivated "to intensify [his] efforts to get people off the roof."  *Id.  Again*, and as stated elsewhere, the complaint omits this language from its reproduction of excerpt (2).  *See* Compl. ¶ 61.  The article simply does not convey the meaning Dr. Armington's complaint subjectively assigns to it, i.e., that he was an accomplice to euthanasia.

Furthermore, as will be demonstrated in Parts III and IV below, the notes taken by both Dr. Fink and The New York Times's fact-checker convincingly leave *no doubt* that, as reported,

Dr. Armington told Dr. Fink that he suspected that other doctors might undertake euthanasia. The article's representations are therefore entirely truthful.

## II.  LA. CODE CIV. PROC art. 971:  Louisiana's anti-SLAPP statute

The substantive law of Louisiana applies to this diversity action.  *Henry*, 566 F.3d at 169. Accordingly, the action is subject to Louisiana Code of Civil Procedure article 971, Louisiana's so-called anti-SLAPP statute.  *Id.* ("Louisiana law, including the nominally-procedural Article 971, governs this diversity case.").  Article 971 states:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.

LA. CODE CIV. PROC. art. 971(A)(1).  The statute further provides that "a prevailing party on a special motion to strike shall be awarded reasonable attorneys fees and costs."  *Id.* art. 971(B).

When the Louisiana legislature enacted article 971 in 1999, it offered the following explanation:

> The legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances. The legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process.

Sec. 2 of Acts 1999, No. 734.

Importantly, the Louisiana legislature concluded: "To this end, it is the intention of the legislature that the Article enacted pursuant to ***this Act shall be construed broadly***."  *Id.* (emphasis added).  Louisiana courts, citing the Louisiana legislature's statement of intent, have granted special motions to strike in numerous cases since article 971's enactment.  *See, e.g., Lee v. Pennington*, 830 So.2d 1037, 1041 (La. App. 4th Cir. 2002), *writ denied*, 836 So.2d 52

10

(La.2003) ("Article 971 was enacted by the legislature as a procedural device to be used early in legal proceedings to screen meritless claims pursued to chill one's constitutional rights under the First Amendment of the United States Constitution to freedom of speech and press."); *see also Melius v. Keiffer*, 980 So.2d 167 (La. App. 4th Cir. 2008) ("The Louisiana legislature enacted La. C.C.P. art. 971 'to screen out meritless claims pursued to chill one's constitutional rights under the First Amendment of the United States Constitution to freedom of speech and press.'"); *Lamz v. Wells*, 938 So.2d 792, 796 (La. App. 1st Cir. 2006) ("The intent of Article 971 is to encourage continued participation in matters of public significance and to prevent this participation from being chilled through an abuse of judicial process."); *Darden v. Smith*, 879 So.2d 390, 394 (La. App. 3d Cir. 2004) (article 971 was "enacted by the legislature to promote participation in matters of public concern"); *Johnson v. KTBS, Inc*, 889 So.2d 329 (La. App. 2d Cir. 2004) (article 971 is "to be used in the early stages of litigation to screen out meritless claims brought primarily to chill the valid exercise of the constitutional rights of freedom of speech"); *Baxter v. Scott*, 847 So.2d 225, 231-32 (La. App. 2d Cir.), *vacated as moot*, 860 So.2d 535 (La. 2003) ("Article 971 is a procedural device to be used in the early stages of litigation to screen those claims which lack merit and which would chill public participation in matters of public interest."); *Stern v. Doe*, 806 So.2d 98, 101 (La. App. 4th Cir. 2001) ("The intent of this statute is to encourage continued participation in matters of public significance and to prevent this participation from being chilled through an abuse of judicial process.").

Article 971, like most anti-SLAPP statutes,[10] operates as a burden-shifting statute.  It requires, first, that the movant-defendant "make a prima facie showing that the matter arises from an act in furtherance of his or her right of free speech or the right of petition and in relation

---

[10] Numerous states have enacted anti-SLAPP statutes.  *See Guam Greyhound, Inc. v. Brizill*, 2008 WL 4206682 (Guam Terr. 2008) (noting that 25 states and Guam have enacted some form of anti-SLAPP statute).

to a public issue." *Darden v. Smith*, 879 So.2d 390, 396 (La. App. 3d Cir.), *writ denied*, 887 So.2d 480 (La. 2004); LA. CODE CIV. PROC. art. 971(F)(1)(d) ("any conduct in furtherance of the exercise of the constitutional right of free speech in connection with a public issue or an issue of public interest" qualifies for article 971 protection). After the defendant makes a prima facie showing that the statute applies, the burden shifts to the plaintiff to "demonstrate a probability of success on his or her own claim." *Darden*, 879 So.2d at 396; LA. CODE CIV. PROC. art. 971(A)(1) (quoted *supra* at page 9). "To establish a probability of prevailing on his claim, a plaintiff must state and substantiate a legally sufficient claim. This is done through a prima facie showing of facts sufficient to sustain a favorable judgment." *Baxter*, 847 So.2d at 231-32. "This requires *more* than that which is necessary to survive a normal motion to dismiss, as 'a defamation plaintiff must produce *evidence* of sufficient quality and quantity to demonstrate that he will be able to meet his burden of proof at trial.'" *Henry*, 566 F.3d at 181 (quoting *Estiverne v. Times-Picayune, L.L.C.*, 950 So.2d 858, 860 (La. App. 4th Cir. 2006)) (emphasis added). Dismissal is warranted if the plaintiff fails to produce sufficient evidence for even a single element of a claim. *See, e.g., Baxter*, 847 So.2d at 234 (plaintiff failed to produce sufficient evidence of malice); *Darden*, 879 So.2d at 393 (same).[11]

A plaintiff faced with a special article 971 motion to strike therefore has a "difficult burden."[12] *Id.* (citation omitted). A court, in deciding whether that burden has been met, "shall consider the pleadings and supporting and opposing affidavits stating the facts upon which the

---

[11] Even on a motion for summary judgment, for which the burden of proof is not as high, the plaintiff is required to produce some evidence sufficient to support *each* element of his claim. LA. CODE CIV. PRO. art 966(C)(2); *see also Kosmitis v. Bailey*, 685 So.2d 1177, 1180 (La. App. 2d Cir. 1996) ("If even one of these elements is lacking, the cause of action fails.").

[12] Even prior to the enactment of article 971, Louisiana courts recognized that the "standards use for summary judgment are somewhat higher in defamation suits," *Spears v. McCormick*, 520 So.2d 805, 808 (La. App. 3d Cir. 1987), and that defamation plaintiffs bear "a burden of proof which is more onerous than usual." *Dwight W. Andrus, Inc. v. Abellor Corp.*, 482 So.2d 1092, 1094 (La. App. 3d Cir. 1986).

liability or defense is based." LA. CODE CIV. PROC. art 971(A)(2); *see also Baxter*, 847 So.2d at 232.

Here, there can be no dispute that this action arises from an act in furtherance of the Defendants' right of free speech, and in relation to a public issue. *See Darden*, 879 So.2d at 396; LA. CODE CIV. PROC. art. 971(F)(1)(d).  The publication of a news article is among the purest exercises of the right of free speech, and how doctors respond to crises presented by natural disaster is indisputably a matter of public interest.  As a result, Dr. Armington's claims—for defamation and false-light invasion of privacy[13] alike—are subject to article 971.

The burden therefore falls on Dr. Armington to establish, at the outset, a probability of success on both claims.  For the reasons explained below, Dr. Armington cannot carry his burden as to either claim.

### III.    Dr. Armington cannot establish probability of success on his defamation claim.

The elements of defamation under Louisiana law are: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." *Kennedy v. Sheriff of E. Baton Rouge*, 935 So.2d 669, 674 (La.2006).  The evidence very strongly suggests that Dr. Armington cannot carry his burden to prove falsity, defamatory meaning, or fault.[14]  The Defendants also observe that it will be difficult for Dr. Armington to prove injury.

---

[13] Article 971 is not limited to a cause of action in defamation.  *Darden*, 879 So.2d at 395-96 (La. App. 3d Cir. 2004) ("We find no merit in the plaintiff's contention that Article 971 is limited to a cause of action in defamation. . . . [T]he declaration of legislative intent indicates a desire for the Article to be 'construed broadly.'").

[14] The Defendants assume, for the purposes of this memo *only*, that Dr. Armington is a private-figure plaintiff and therefore assume that, as to element (3), Dr. Armington need prove only fault, i.e. negligence.

The Defendants believe, however, that Dr. Armington is a public figure for the limited purposes of this lawsuit, and therefore, under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), at trial Dr. Armington would have the more difficult burden to prove malice.  *See infra* footnote 16 and accompanying text.  A public-figure plaintiff, of course,

13

300566v.1

### A. Falsity

First, and as a threshold matter, the evidence very strongly supports the article's truthfulness, and therefore that Dr. Armington cannot carry his burden to prove falsity.

A defamation plaintiff has the burden to prove falsity by a preponderance of the evidence. *Rachal v. Dep't. of Wildlife & Fisheries*, 918 So.2d 570, 574-75 (La. App. 3d Cir. 2005); *Thompson v. Lee*, 888 So.2d 300, 304 (La. App. 2d Cir. 2004) (truth is an absolute defense). "Proof by a preponderance of the evidence is sufficient when the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not." *See, e.g., Daniel v. House of Raeford Farms of La.*, --- So.3d ----, 2009 WL 3019509, *4 (La. App. 2d Cir. 2009).

Here, the Defendants' substantial and corroborated evidence demonstrates that the article is truthful; that is, that Dr. Armington told Dr. Fink that he suspected that other doctors might undertake euthanasia.

As the attached affidavits state, at trial the Defendants would offer testimony from Dr. Fink that Dr. Armington made the reported statements to her, and from Charles Wilson, The New York Times's staff editor responsible for fact-checking the portions of the article that refer

---

need not be a public official or a celebrity. For the purposes of a defamation lawsuit, it is enough that a plaintiff voluntarily injects, or thrusts, himself to the forefront of the public controversy at issue. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). Such a plaintiff becomes a public figure for the limited purpose of the underlying lawsuit. To determine whether a plaintiff is a so-called limited-purpose, public-figure plaintiff, the Fifth Circuit employs a three-step test, under which "(1) [t]he controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy." *Trotter v. Jack Anderson Enterprises, Inc.*, 818 F.2d 431, 433-34 (5th Cir. 1987). The Defendants submit that under the Fifth Circuit's test, Dr. Armington is a public figure.

The private-figure/public-figure distinction, however, need not distract the Court here. Given that Dr. Armington cannot carry even the lighter burden of proof the law permits private-figure plaintiffs, *see infra* footnote 16 and accompanying text, the Defendants, without conceding that Dr. Armington is a private-figure plaintiff, treat him as such for the purposes of this motion.

to Dr. Armington, that the published article accurately reflects statements Dr. Armington made to him. *See* Fink Aff. & Wilson Aff.

The Defendants would also offer the notes Dr. Fink recorded at the time she interviewed Dr. Armington. Dr. Fink interviewed Dr. Armington via phone on December 7 and December 14, 2008. Exs. B & C to Fink Aff.; Typewritten notes from December 7, 2008, and December 14, 2008, interviews, respectively. During both interviews, Dr. Fink simultaneously recorded Dr. Armington's words by typing notes on her computer. Fink Aff. ¶ 7. The notes from the December 14, 2008, interview furnish *ample* support for the assertions in excerpts (1) and (2) of the article. Ex. C. to Fink Aff.; Typewritten notes from December 14, 2008, interview. As to excerpt (1), Dr. Fink recorded the following, in Dr. Armington's voice:

> We thought DNR patients had expressed a wish to not have extraordinary means extended to prolong their life, and we kind of extrapolated that to mean they would not want to have their lives saved at the expense of another. We felt we would honor their wishes, do everything possible for them realizing they would be the last … ..but we wouldn't sacrifice others in order to save them, and we would make sure that we did everything we could within the limitations of our resources for them. I really had the sense that everybody was of one mind that we would work until exhaustion to be sure that everyone was cared for, and that we wouldn't give up on anyone.

The article, at excerpt (1), accurately reflects Dr. Armington's own words.

As to excerpt (2), Dr. Fink recorded, in Dr. Armington's voice:

> I do recall when we were on the 2nd floor would have been on Th, there was some what of a disc that had transpired about DNRs, and I talked with not John Thiele, John was actually looking really haggard at the time, looked like he really had nothing to offer, *Ewing Cook and I talked briefly and he had indicated that there had been some disc, which I though was a disc about euthanasia, and he said that there had been a disc about, and I think way he said it was about things that only doctors talk about, and that he didn't really elaborate more than that, but I took it to be that there had been some disc about euth,* I didn't know what the upshot of that was. It was about that time, that a fellow who'd been working in the ER who was ER doc, who I subsequently learned went to CNN and said they were killing people. He was grabbing his on bag, it was really heated, he said I'm getting out of here, this isn't what I've signed up to do. My thought was here's a doc, what the hell is he doing leaving for whatever his reason, I was upset with him that he would abandon his patients, I thought that was ridiculous, but you

don't leave.  I think other people had similar feelings, it was right that time, he did sub leave, so we had one less doctor to care of the patients who were sub left.

* * *

(I heard you brought up the euthanasia issue with Richard Deichmann in the parking garage, asking about having a meeting with the medical staff to discuss euthanasia?)  I don't remember bringing it up, if I had brought it up, it probably would have been from the point of view of hearing rumblings about that to get it out in the open so we could clearly discuss issues and not have the decision be made by a few medical staff in a dark corner.  I remember talking with Richard in the parking garage.  I don't remember the content.  Had it been on those lines, that's where my heart was going.

Dr. Fink's notes reflect that later, in the same interview, Dr. Armington reiterates the

same version of events:

(Can you reconstruct for me what your impression of it all was, what you saw and what your role was?)  I have a very clear recoll of just sort of passing through the second floor which had turned into the ICR, second floor waiting area at the outskirts of radiology, that's where Ewing Cook mentioned to me that there had been disc of things only doctors talk about.  That's when I saw John Thiele, he looked ashen.  I remember Anna was fairly busy there.  *My sense was had they been talking about euthanasia, I was going to be doing my job which was getting as many people out of there as possible.*  I remember being stirred up to intensify my efforts to get people off the roof.  I don't have recoll of being party of disc of doses of morphine.  I do remember there was kind of an undercurrent and certainly the issue that one guy railed against and walked out.  I wanted to get as many people out of the hospital as I could, I wanted to …

* * *

(That sounds really hard.  But do you remember any DNR patients getting out?)  I remember some sick folks we were getting out?  (You were not down on 2nd floor that point?)  After I did my walk through and saw Anna doing things on 2nd floor and that guy was taking off with his knapsack, John looking ashen and Ewing, I headed for the aperture and did my org[anizing?] things.  (Did you say anything?)  To John?  No, I don't think I did.  I think that part of it was that I just, I wanted to go on with my own operational motive and I didn't want to be sidetracked by dealing with other issues.  I just wanted to see to it that as many patients as I could get out of there could be got out of there.  I wanted to be more action than discussion at that time, with the exception that I would have wanted to talk about the idea of euthanasia just to put it to rest so we could go on about our business and get as many people out as we could.  (When Ewing made his sideways remark, did you express your opinion?)  I think nodded my head in a knowing way… (You remember BK walking out of there?)  I do.  I was … I remember him saying this wasn't what I signed up for and saying I'm getting out of here.  He had a knapsack, and I remember him throwing it over his shoulders to go down to the ER.  I thought 'what are you doing?'  (How did you make sense of it?)  Probably the best indication of how a person feels is how they act.  My action at that point in time was to intensify my efforts to get people out.  I went over and started working more with the line and getting people going.  I had the very clear sense I could not control how everybody responded but I could control

16

how I responded.  *I remember thinking specifically if euthanasia is a discussion and if somebody is going to act on it, I don't know that I can stop them from doing it, and everybody is going to make their own moral decision, and I'm making my own moral decision now, to act to get people out of here.*  My decision was not to stick around, poke around [with the] idea, saying 'I'll be willing to help out, why don't you give me a couple of syringes of mso4 and I'll see what I can do.'  My decision was to get the people out.  I don't remember specifically things that were said that's how I handled it.  I didn't want to be part of euthanasia, but unlike Bryant King, who extricated himself from the situation and did what I thought was right without trying to convince others otherwise.  If I did have that conversation with Richard, the fact it was closed down only made me more desirous of ending the situation as soon as I could by getting people out.

And *again*, in the same interview, Dr. Armington discusses the same events:

(One more thing about Thursday afternoon, when Bryant King walked out, did anyone say anything?)  We sort of looked at each other, it was like 'what an asshole.'  We didn't discuss and say what could have done [to keep him there]…some expressed he should have stuck around to help.  *Nobody said here's a guy who had high moral stds and didn't want to participate in euth.*  I remember thinking the guy was just a jerk.  I thought there's no place for that kind of eruption in the middle of a situation like this.  *(How did you feel at the time?  Did you think eh was taking a stand against euthanasia, or was just trying to get out)*  Look for an excuse to get out?  I'm putting that out there…I had never had an interaction with him before.  He, I think, was locums, I recognized that he worked in the ER, I don't remember having professional interaction with him before, really first time I saw him and was focused on him, he was making his statement…

When on August 17, 2009, just days before publication, Dr. Fink called Dr. Armington to fact-check the text she had written, Dr. Armington confirmed relevant portions of their prior conversations.  Ex. D to Fink Aff.; Typewritten notes from August 17, 2009, conversation.

Relevant to excerpt (1), Dr. Fink's notes from the August 17, 2009, conversation reflect:

(Described to him the meeting after decision to close hospital, on 4th floor in nursing training room which was command center, discussion around what to do with patients.  He agreed with all that.  Then I said someone, perhaps Deichmann sugg the DNRs go land, but of course you didn't think that was a momentous decision at the time…)  I think we had a sense that if things didn't go well, but that was probably the appropriate decision to make, to defer the DNRs.

(And you said that was b/c people who didn't want extraordinary measures wouldn't' wat to be saved at expense of others?)

Exactly.

Relevant to excerpt (2), Dr. Fink's notes from the same conversation reflect:

(I read him the part about his view on the euthanasia and on Bryant King leaving.) That's what was going on with me.

Mm hmm

I think it's a very generalizable lesson, people in that situation, decisions people make and what happens, I think it's something a lot of people can learn from…impt story to be told.

In sum, those representations in the article that relate to Dr. Armington are fully (and repeatedly) supported by the notes taken contemporaneously by Dr. Fink.

Finally, the Defendants would offer the notes of Charles Wilson, The New York Times's fact-checker, which reflect statements made by Dr. Armington to Wilson, just days before the article's publication. Wilson spoke with Dr. Armington via telephone twice on August 20, 2009. Wilson Aff. ¶ 8. While speaking with Dr. Armington, Wilson made notes on draft copies of the article. Those notes reflect:

- To the side of a paragraph beginning at the foot of page 9 of the draft, Wilson made small check marks. Those check marks reflect that Dr. Armington confirmed the paragraph's assertions in what would become excerpt (1). Ex. A to Wilson Aff.; Wilson Aff. ¶ 15.

- On page 41, to the side of the paragraph that would become excerpt (2), Wilson made small check marks and crossed off text, reflecting that Dr. Armington confirmed that he had heard from Dr. Cook about a discussion of "things that only doctors talk about." Ex. B to Wilson Aff.; Wilson Aff. ¶ 16.

- In the margin on page 41, Wilson's notes indicate that during the crisis Dr. Armington believed that euthanasia "might occur." Ex. B to Wilson Aff. A note reflecting that clarification appears on a later proof draft of the article. *See* Ex. C to Wilson Aff. The correction, replacing "was occurring" with "might occur," is reflected in the final, published version of the article.

- Also in the margin on page 41, Wilson's notes indicate that Dr. Armington told him "Euthanasia might be considered in the not too distant future" and that Dr.

Armington felt that "conditions were devolving in a way that euthanasia might soon seem an option." Ex. B. to Wilson Aff.; Wilson Aff. ¶ 18.

Clearly, Wilson's notes reflect that Dr. Armington was apprised of the article's content, that The New York Times edited the article in response to Dr. Armington's statements to Wilson, and that the published article accurately reflects statements made by Dr. Armington to Dr. Fink and Wilson. *See generally* Fink & Wilson Affs. & exhibits thereto. Wilson's notes convincingly leave no doubt that, as reported, Dr. Armington said that he suspected that other doctors might undertake euthanasia.

In sum, the Defendants' evidence conclusively demonstrates the article is truthful. To summarize: On December 14, 2008, Dr. Armington told Dr. Fink that Dr. Cook told him that there had been a discussion "about things that only doctors talk about"; that he "took it to be" that "there had been some discussion about euthanasia"; that he told himself that if euthanasia were used, "I'm making my own moral decision now, to act to get people out of here"; and that he was angry with Dr. King for leaving the hospital. On August 17, 2009, Dr. Fink read to Dr. Armington "the part about his view on the euthanasia," and he told her, "That's what was going on with me." Finally, on August 20, 2009, Dr. Armington told Charles Wilson that he believed euthanasia might occur. These statements, made on three separate occasions, are wholly consistent with the article's representation that Dr. Armington told Dr. Fink that he "suspected that euthanasia might occur." In the light of the evidence, Dr. Armington simply cannot prove falsity "is more probable than not."

### B. Defamatory meaning

Even assuming the article is false, which is denied, the article is not defamatory. "Defamatory words are, by definition, words which tend to harm the reputation of another so as to lower the person in the estimation of the community, to deter others from associating or

19

dealing with the person, or otherwise expose a person to contempt or ridicule." *Costello v. Hardy*, 864 So.2d 129, 140 (La. 2004). "The question of whether a communication is capable of a particular meaning and whether that meaning is defamatory is ultimately a legal question for the court." *Thinkstream, Inc. v. Rubin*, 971 So.2d 1097, 1101 (La. App. 1st Cir. 2007). "The question is answered by determining whether a listener could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense." *Id.*   A court looks at the communication *as a whole*, not at words in isolation:

> The intent and meaning of an alleged defamatory statement must be gathered not only from the words singled out as libelous but from the context as well, and the true meaning must be ascertained from a consideration of all parts of the statement as well as the circumstances of its publication.

*McConathy v. Ungar*, 765 So.2d 1214, 1217 (La. App. 2d Cir. 2000) (quoting *Brown v. News-World Publishing Corp.*, 245 So.2d 430, 432 (La. App. 2d Cir.1971)).

Defamatory meaning ordinarily is not presumed; it must be proved.[15] *See Thinkstream*, 971 So.2d 1092   (statement which suggested company bribed public officials was not defamatory); *Blackburn v. Gengelbach*, 873 So.2d 713 (La. App. 1st Cir. 2004) (letter that stated that doctor had rendered inappropriate medical treatment was not defamatory; "Considering the statement taken as a whole, the context in which it was made, and the effect it is reasonably intended to produce, this court finds that the letter from Dr. Gengelbach to Lisa Whaley was not

---

[15] Under the traditional rule, where the words at issue are defamatory *per se*, fault or malice is presumed.  Of course, the words at issue here are not defamatory *per se*.  *See, e.g., Bradford v. Judson*, 12 So.3d 974, 978 (La. App. 2d Cir. 2009) ("[W]ords that are defamatory per se are those which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, without considering extrinsic facts or circumstances.").   But whether the words are defamatory *per se* makes little difference after *Kennedy v. Sheriff of East Baton Rouge*, 935 So.2d 669 (La. 2006).  In that case the Louisiana Supreme Court held that a private-figure plaintiff who was falsely accused of criminal conduct nevertheless had the burden of proving falsity and fault.  *Id.* at 675, 681 ("Based on the foregoing, to prevail on his claim against Jack in the Box, in the present case, Kennedy bears the burden of affirmatively proving (1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) negligence (as set forth in the Restatement (Second) Of Torts § 580B) on the part of Jack in the Box's employees; and (4) resulting injury. If even one of these required elements is found lacking, the cause of action fails.").

defamatory."); *McConathy*, 765 So.2d 1214 (letters mailed to thousands of Louisiana residents, which stated that insurance polices were worthless, did not defame individual insurance salesman who sold said policies); *Guilbeaux v. Times of Acadiana, Inc*., 661 So.2d 1027 (La. App. 3d Cir. 1995) (statement in published article that plaintiff was a "violently mad," "tall burley [sic] business man" were not defamatory; "This statement merely describes plaintiff's physical appearance and further uses adjectives which describe his state of mind. Clearly, this statement alone or read in conjunction with the other allegations of the petition does not rise to the level of defamation.").

Here, a reasonable reader, considering the article as a whole, would not understand it to defame Dr. Armington.  Again, the 20+-page article mentions Dr. Armington only twice. Ex. A to Fink Aff.; *supra* Part I.A.  The first mention, excerpt (1), merely relays that Dr. Armington stated that "he thought that patients who did not wish their lives to be prolonged by extraordinary measures wouldn't want to be saved at the expense of others."  *Id.*  The second mention, excerpt (2), states that Dr. Armington came to suspect that euthanasia might be used, and immediately thereafter, the article explains that this caused Armington "to intensify [his] efforts to get people off the roof."  *Id.*

Objectively, nothing in these words is defamatory.  These words do not convey the meaning Dr. Armington subjectively assigns to them; they do *not*, as Dr. Armington contends, convey that Dr. Armington was an accomplice to euthanasia.  A reasonable reader, considering the article as a whole, would understand that Dr. Armington was but one of many doctors who were present at Memorial during and after Hurricane Katrina, and that Dr. Armington learned of the possibility of euthansia through a conversation in which someone told him "there had been a discussion of 'things that only doctors talk about.'"  The article does not attribute any decision to

21

use euthanasia to Dr. Armington, and does not link Dr. Armington to other doctors' actions.  The article makes clear that Dr. Armington himself was not present when the decision to use euthanasia was purportedly made by other doctors.

Likewise, Dr. Armington's claim that the article implies that he was somehow professionally "derelict," Compl. ¶ 65, is premised on an implausible reading of excerpt (2).  That paragraph states—truthfully, as Dr. Armington acknowledges—that "neither Armington nor King intervened directly" with any doctors who might be considering euthanasia, but the paragraph continues and points out that, as conditions worsened at Memorial, Armington felt "stirred up" and "decided to intensify [his] efforts to get people off the roof."  Consistent with that, as the article says, he "headed for the helipad," where he and others labored under incredibly difficult circumstances to save the lives of patients.  Far from implying some dereliction of duty, the paragraph portrays Dr. Armington as a lifesaver—a point underscored in the paragraph by its portrayal of the markedly different decisions made by his colleague, Dr. King.  The article's portrayal of Dr. Armington as a doctor who viewed the evacuation of patients as his number one priority—and who acted on that view—is certainly not defamatory.

In sum, Dr. Armington cannot carry his burden to prove defamatory meaning.

### C. Fault

For the same reason Dr. Armington cannot prove falsity, he also cannot prove fault.  In a case involving speech on a matter of public concern, a private-figure plaintiff can prove fault by showing that the defendant (a) knew that the statement was false, (b) acted in reckless disregard of the truth, or (c) was negligent in failing to ascertain the truth.  *Kennedy v. Sheriff of East*

*Baton Rouge*, 935 So.2d 669, 681 (La. 2006) (citing RESTATEMENT (SECOND) OF TORTS § 580B; *Costello*, 864 So.2d at 143).[16]

Even assuming that Dr. Armington could prove falsity, he certainly cannot prove the Defendants' knowledge of falsity, reckless disregard of the truth, or negligence in ascertaining the truth.  As explained above, the notes Dr. Fink recorded at the time she interviewed Dr. Armington serve not only to confirm that Dr. Armington made the statements to Dr. Fink as reported, but also to demonstrate that Dr. Fink's reportage was neither reckless nor negligent. Testimony from Charles Wilson, The New York Times's fact-checker, further shows that the Defendants were neither reckless nor negligent in preparing the article for publication.  In sum, Dr. Armington cannot prove that the Defendants published the article "without reasonable grounds for believing it to be true."

### D. Injury

Finally, the Defendants merely observe that it will be difficult for Dr. Armington produce facts sufficient to support a finding that he has been injured by the article.  "Regardless of the type of injury asserted, [] the plaintiff must present competent evidence of the injuries suffered. Plaintiff must also demonstrate that the defamatory statements were a substantial factor in

---

[16] Of course, the burden of proof is more difficult for plaintiffs who are public figures.  While a private-figure plaintiff has the burden to prove fault, a public-figure plaintiff has the burden to prove malice.  *Kennedy v. Sheriff of East Baton Rouge,* 935 So.2d 669, 678-79 (La. 2006); *see also generally New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).   A plaintiff can prove fault by showing that a defendant was negligent in ascertaining the truth. *Kennedy*, 935 So.2d at 681.  But to prove malice, a plaintiff must show that the defendant either knew the article's assertions were false or acted with reckless disregard for the truth.  *Costello v. Hardy*, 864 So.2d 129, 140-41 (La. 2004).

As explained *supra* in footnote 14, the Defendants believe that Dr. Armington is a public figure for the limited purposes of this lawsuit and that at trial Dr. Armington would be required to prove not merely fault, but malice. Given, however, that in the light of the evidence Dr. Armington cannot carry his burden to prove even fault, clearly he cannot carry the more difficult burden to prove malice.  Thus, to reiterate footnote 14, without conceding that Dr. Armington is a private-figure plaintiff, the Defendants nevertheless treat him as a private figure plaintiff for the purposes of this motion.

causing the harm." *Williams v. Allen*, 15 So.3d 1282, 1288 (La. App. 2d Cir. 2009).  It is not enough that Dr. Armington allege generally that he has "suffered great harm, humiliation, embarrassment and loss of reputation."  He must prove that the portions of the article "of and concerning" him were a substantial factor in causing the harm.[17]

## IV.   Dr. Armington cannot establish probability of success on his false light claim.

For the same reasons Dr. Armington cannot establish a probability of success on his defamation claim, he also cannot establish a probability of success on his false light claim.

The so-called "false-light" invasion of privacy cause of action "arises from publicity which unreasonably places the plaintiff in a false light before the public.  The publicity need not be defamatory in nature, but must be objectionable to a reasonable person under the circumstances and *must contain either falsity or fiction*."   *Perere v. Louisiana Television Broadcasting Corp.*, 721 So.2d 1075, 1078 (La. App. 1st Cir. 1998) (emphasis added).

The most obvious reason Dr. Armington will not prevail in his false-light claim is that the publicity contains neither falsity nor fiction.  As stated previously, the Defendants anticipate showing—through the testimony of Dr. Fink and of Charles Wilson, The New York Times's fact-checker, as well as through the meticulous notes of each—that the article accurately reflects statements made by Dr. Armington.  *See* Fink & Wilson Affs. & exhibits thereto.  It is highly improbable that Dr. Armington can prove falsity.

---

[17] Under Louisiana precedent, that is not an easy burden to carry.  *Williams*, 15 So.3d at 1288 ("In this case, Park testified that a real estate agent, Janet McCord, declined to work for plaintiff's business because of concern over plaintiff's reputation. However, the testimony showed that McCord not only discussed the job with Park, but interviewed with the plaintiff despite Allen's previous accusation. Thus, the record supports a finding that Allen's remarks were not a substantial factor in the agent's choice not to accept the job with plaintiff."); *Johnson v. KTBS, Inc¸* 889 So.2d 329, 332-33 (La. App. 2d Cir. 2004) (children of murder victims did not show that televised broadcast, during which reporter alleged that plaintiffs' parents were related as brother and sister, injured them; "Other than the unsupported conclusions stated in their affidavits, the plaintiffs have not shown how their reputations in the community were harmed by the statement concerning their deceased parents.").

Furthermore, the publicity does not rise to a level that is objectionable to a reasonable person.  While, under this claim, Dr. Armington need not prove the publicity was defamatory, he nevertheless must show that it was *objectively* objectionable.  It is highly improbable, however, that Dr. Armington will carry that burden.  As explained elsewhere, Dr. Armington's complaint already grossly misrepresents the article and the incidence of Dr. Armington's appearances in it.  The article does not, as the complaint alleges, convey that Dr. Armington was an accomplice to euthanasia.  The article does state that Dr. Armington stated that he suspected that euthanasia might be used, but immediately thereafter explains that this caused Armington "to intensify [his] efforts to get people off the roof."  Again, Dr. Armington fails in his complaint to acknowledge that complimentary language.

In sum, objectively, there is nothing objectionable in the article's truthful representation of Dr. Armington's own words.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully submit that Dr. Armington's action must be dismissed.  Further, the Defendants respectfully request that the Court award them reasonable attorneys fees and costs in an amount to be proven.  LA. CODE CIV. PROC. art. 971(B) ("a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs").[18]

---

[18] The award of attorneys fees to a party prevailing on a special article 971 motion to strike is not discretionary. *Davis v. Benton*, 874 So. 2d 185, 191 (La. App. 1st Cir. 2004) (noting award of attorney fees is mandatory and affirming award of $5000 to prevailing defendant); *Darden v. Smith*, 879 So. 2d 390, 400 (La. App. 3d Cir. 2004) ("In light of the mandatory language of the article, we award attorney's fees and costs."); *Lee v. Pennington*, 830 So.2d 1037, 1046 (La. App. 4th Cir. 2002) (reversing the trial court's refusal to award attorney's fees and holding that "[t]he language of the statute is clear that attorney fees *must* be awarded to the prevailing defendant").

Respectfully submitted,


_____/s/ Loretta G. Mince_____
James R. Swanson, 18455
Loretta G. Mince, 25796
FISHMAN HAYGOOD PHELPS
   WALMSLEY WILLIS & SWANSON, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana  70170-4600
Telephone:  (504) 586-5252
Facsimile:  (504) 586-5250
*Attorneys for Sheri Fink, M.D., ProPublica*
*and The New York Times*

26

## TABLE OF AFFIDAVITS & EXHIBITS

|  | **Description** |
|---|---|
| Fink. Aff. | **Affidavit of Sheri Fink** |
| Ex. A to Fink Aff. | Final, published article, with excerpts (1) and (2) marked |
| Ex. B to Fink Aff. | Typewritten notes from Sheri Fink's December 7, 2008, telephone interview of Dr. Armington |
| Ex. C to Fink Aff. | Typewritten notes from Sheri Fink's December 14, 2008, telephone interview of Dr. Armington |
| Ex. D to Fink Aff. | Typewritten notes from Sheri Fink's August 17, 2009, telephone conversation with Dr. Armington |
| Wilson Aff. | **Affidavit of Charles Wilson** |
| Ex. A to Wilson Aff. | Pages 9-10 from unformatted, draft copy of the article, on which Charles Wilson made check marks while speaking with Dr. Armington |
| Ex. B to Wilson Aff. | Page 41 from unformatted, draft copy of the article, on which Charles Wilson made check marks and took notes while speaking with Dr. Armington |
| Ex. C to Wilson Aff. | Page 41 from formatted, draft copy of the article labeled "Proof 1," on which Charles Wilson made notes while speaking with Dr. Armington |
| Ex. D to Wilson Aff. | Page 41 from formatted, draft copy of the article labeled "Pre-Beautified Proof 2," on which Charles Wilson made notes |