UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

WILLIAM ARMINGTON, M.D.                   CIVIL ACTION

VERSUS                                                 NO. 09-6785

SHERI FINK ET AL.                            SECTION "F"

## ORDER AND REASONS

Before the Court are the defendants' special motion to strike and the plaintiff's motion to conduct discovery and motion to continue the special motion to strike. For the following reasons, the defendants' special motion to strike is GRANTED; the plaintiff's motions are DENIED.

## **Background**

On August 25, 2009, nearly four years after Hurricane Katrina, *The New York Times Magazine* published a 13,000 word online article entitled "Strained by Katrina, a Hospital Faced Deadly Choices." The article was written by Dr. Sheri Fink and edited by ProPublica and *The New York Times*. In this lawsuit, the plaintiff, Dr. William Armington, contends that the article defamed him and placed him in a false light.

The article describes the stressful events at Memorial Medical Center in Uptown New Orleans in the days after Hurricane Katrina and states that "[i]t is now evident that more medical professionals were involved in the decision to inject patients – and far more patients were injected – than was previously

1

understood." While the article primarily discusses the intensively scrutinized behavior of Dr. Anna Pou, one of the doctors arrested and charged with the deaths of some patients, it does twice mention Dr. Armington, a neuroradiologist and colleague of Dr. Pou; he was working at Memorial during the evacuation. The *Times* piece asserts that after a meeting with many of the (unidentified) doctors, it was decided that patients with Do Not Resuscitate orders would be evacuated last. The author explains that a D.N.R. order is an order not to revive a patient whose heartbeat and breathing has stopped. The author also writes that Dr. Armington told her "that patients who did not wish their lives to be prolonged by extraordinary measures wouldn't want to be saved at the expense of others." Later, the article suggests that Dr. Pou (who was publicly exonerated) had administered lethal doses of morphine to certain patients, and continues:

> Patients were hot and uncomfortable, and a few might be terminally ill, but [Dr. King] didn't think they were in the kind of pain that calls for sedation, let alone mercy killing. When he saw Pou with the syringes, he assumed she was doing just that and said to anyone within earshot: "I'm getting out of here. This is crazy!" King grabbed his bag and stormed downstairs to get on a boat.
>     Bill Armington, the neuroradiologist, watched King go and was upset at him for leaving. Armington suspected that euthanasia might occur, in part, he told me, because Cook told him earlier that there had been a discussion of "things that only doctors talk about." Armington headed for the helipad, "stirred up," as he recalls, "to intensify my efforts to get people off the roof." Neither Armington nor King intervened directly, though King had earlier sent out text messages to friends and family asking them to tell the media that doctors were discussing giving medication to dying patients to help

accelerate their deaths.

Dr. Armington submits that the article was sensational and scandalous and resurrected an issue long after the state investigation had been closed. He asserts that in Dr. Fink's interview with him, he stated he had no knowledge of any plans of euthanasia and complains that the article's statements and inferences about him are false and misleading. But the plaintiff overstates the effect of the two references to him in an otherwise rather oddly-timed piece.

The defendants have filed a special motion to strike under Article 971 of the Louisiana Code of Civil Procedure. Article 971 is Louisiana's anti-SLAPP statute (Strategic Lawsuit Against Public Participation), which requires a stay of discovery until resolution of the motion and is available where a plaintiff has sued a person exercising free speech. The plaintiff has responded by filing a motion to conduct discovery prior to the resolution of the motion to strike and adds a motion to continue the motion to strike so that the discovery issue could be resolved.

Defendants submit that a special motion to strike is available because the *Times* article is undisputedly an act in furtherance of the defendants' free speech rights. They argue that Dr. Armington cannot satisfy his burden of showing a fair probability of success on his defamation claim because he cannot show that the statements about him are false or, even more notably, that the article is

capable of defamatory meaning. They insist that even if the statements are false, Dr. Armington cannot show that the defendants are at fault, noting that Dr. Fink recorded her interview, the article is consistent with her notes, and a fact checker reviewed the draft with Dr. Armington. The defendants add that Dr. Armington will not be able to prove that the article was a substantial factor in causing any injuries received. They submit that Dr. Armington's false light claim must also fail because the publicity is neither false nor fiction, nor does it rise to a level that could be objectionable to a reasonable person.

As to the plaintiff's motion to conduct discovery, defendants argue that under Rule 56(f) or Article 971(D), the plaintiff is not entitled to a continuance to conduct discovery because he has not explained what discoverable facts will enable him to rebut the special motion to strike.

The plaintiff responds rather casually that Article 971 is unconstitutional to the extent it is used to deny him meaningful access to the courts;[1] he adds that by staying discovery, Article

---

[1] The issue of the constitutionality of Article 971 has only been summarily briefed. The parties seem to suggest that the constitutionality of Article 971 is not the issue driving these motions. Further, while the plaintiff has presented no cases holding a similar anti-SLAPP statute unconstitutional, the defendants have cited several cases, including a Louisiana court of appeals decision, holding anti-SLAPP statutes constitutional. See Lee v. Pennington, 830 So. 2d 1037, 1042-43 (La App. 4th Cir. 2002); see also Guam Greyhound, Inc. v. Brizill, No. CVA 07-021, 2008 WL 4206682, at & 5-7 (Guam Sept. 11, 2008); Lafayette Morehouse, Inc. v. Chronicle Publishing Co., 37 Cal. App. 4th 855,

4

971 "directly collides" with Rule 56, and the Court must therefore permit discovery before ruling in favor of the defendants. Even if the Court considers the Article 971 claim, the plaintiff asserts, the defendant has failed to establish that the article was published in furtherance of the defendants free speech rights and in relation to a public issue. He submits that simply asserting that the article was of public interest is insufficient. (He glosses over the current media culture, and how what is in the "public interest" today has been rather stretched).

The plaintiff correctly urges that under Article 971, he must only demonstrate a probability of success and that the statute is intended to weed out only clearly meritless claims. He contends that his claim survives this analysis because he has produced some supporting evidence for each element of his claim in the form of his affidavit which states that he did not know of or suspect euthanasia and that he told Dr. Fink and the fact checker this. He charges that the article clearly describes Dr. Armington as upset at Dr. King for leaving because Dr. King suspected euthanasia and as suspecting euthanasia but doing nothing to stop it and that these statements are false. He adds that by accusing Dr. Pou and her "colleagues" and "more medical professionals" of being involved, the article implicated Dr. Armington as aiding or

---

865-66 (Cal Ct. App. 1995).

abetting euthanasia. Euthanasia is, of course, a crime in Louisiana; thus, the plaintiff contends, the article is a per se defamatory accusation of criminal conduct. He adds that accusing Dr. Armington of doing nothing despite suspecting euthanasia is also plainly susceptible to defamatory meaning.

The plaintiff points out that he is a private figure and that under the negligence standard, he has submitted evidence of fault by his affidavit, in which he asserts that Dr. Fink's notes do not accurately reflect their conversations. He adds that the draft of the article contains statements the defendants admit are false, which shows, the plaintiff contends, that the defendants had a preconceived idea of what the investigation would conclude and, because the final article is more subtle, supports Dr. Armington's assertion that he told the fact checker he did not suspect euthanasia was occurring. Finally, the plaintiff argues that he can further demonstrate fault because prior to initiation of the lawsuit, his counsel informed the defendants that Dr. Armington was not involved with the decision to inject patients, but the defendants refused to issue a retraction.

## **Law and Analysis**

I.

The Fifth Circuit has held that, in a diversity case like this one, "Louisiana law, including the nominally-procedural Article

6

971" governs.[2] See Henry v. Lake Charles Am. Press, L.L.C., 566 F.3d 164, 168-69 (5th Cir. 2009). Article 971 instructs that a plaintiff who files suit "against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . in connection with a public issue" is subject to a special motion to strike. La. Code Civ. Proc. art. 971. Upon

---

[2] The plaintiff submits that article 971 is procedural and that it should not be applied in federal court because its discovery staying procedure directly collides with the Federal Rules of Civil Procedure on summary judgment. The Fifth Circuit did not address this argument directly in making its pronouncement in Henry.

In a diversity case where a state law may conflict with a Federal Rule of Civil Procedure, the Court must determine whether there is a "direct collision" between the federal rule and state law. Walker v. Armco Steel Corp., 446 U.S. 740, 749 (1980). If so, the federal rule trumps. Hanna v. Plumer, 380 U.S. 460, 473-74 (1965). If not, the usual Erie analysis applies. Walker, 466 U.S. at 749. The Ninth Circuit has held that the provisions of California's similar anti-SLAPP law "can exist side by side" with Federal Rules 8, 12, and 56. U.S. ex rel Newsham v. Lockheed Missiles & Space Co., Inc., 190 F.3d 963, 972 (9th Cir. 1999); see Thomas v. Fry's Elecs., Inc., 400 F.3d 1206, 1206-07 (9th Cir. 2005) (per curium) (affirming Lockheed). Further, the Ninth Circuit determined that the Erie interests in discouraging forum shopping and avoiding inequitable administration of the law favored the application of California's anti-SLAPP provisions and held the provisions to be available in federal court. Lockheed, 190 F.3d at 973.

This Court agrees. Article 971 does not directly collide with Rule 56. Rule 56 summary judgment remains available to the parties, and Article 971 permits the Court to order specified discovery where necessary to the plaintiff's opposition (similar to the relief afforded by Rule 56(f)). Louisiana has important interests in the application of its anti-SLAPP law, and its application will ensure that defendants, whether in diversity or not, will be protected from meritless defamation claims and the resulting fishing expeditions that might chill the exercise of their speech rights.

filing of a special motion to strike, all discovery proceedings are stayed until a court determines whether the plaintiff has established a probability of success on the merits. Id. art. 971(D). On noticed motion and "for good cause shown," a court may order that specified discovery be conducted before ruling on the special motion to strike. Id. The prevailing party on a special motion to strike is entitled to attorney fees and costs. Id. art. 971(B). If a court determines that the plaintiff has a probability of success on the claim, this determination is admissible in later stages of the proceedings. Id. art. 971(A)(3).

Article 971 is Louisiana's anti-SLAPP procedure, enacted to address a "strategic lawsuit against public participation." See Henry, 566 F.3d at 169. "The purpose of the special motion to strike 'is to encourage continued participation in matters of public significance and to prevent this participation from being chilled through an abuse of judicial process.'" Savoie v. Page, 23 So. 3d 1013, 1016 (La. App. 3rd Cir. 2009) (quoting Lamz v. Wells, 938 So. 2d 792, 796 (La. App. 1st Cir. 2006)). Thus, the device is intended "to be used early in legal proceedings to screen meritless claims." Henry, 566 F.3d at 169 (quoting Lee v. Pennington, 830 So. 2d 1037, 1041 (La. App. 4th Cir. 2002)).

To achieve its purpose, "Article 971 establishes a burden-shifting analysis." Henry, 566 F.3d at 170. First, the defendants must make a prima facie showing that the action against them arises

8

from an act in furtherance of their right of petition or free speech in connection with a public issue. See id. For example, Louisiana courts have found Article 971 available where a newspaper publishes an article on the sudden removal of a radio station from the airwaves, Starr v. Boudreaux, 978 So. 2d 384, 389 (La. App. 1st Cir. 2007), or a news station broadcasts a story about a couple's murder, Johnson v. KTBS, Inc., 889 So. 2d 329, 332 (La. App. 2 Cir. 2004). In Henry, the Fifth Circuit found the defendants had met their burden where they had published a series of news articles about the loss of a government contract and the investigation of an entity doing business with the federal and state governments. 566 F.3d at 181.

If the defendants succeed, "the burden then shifts to the plaintiff to demonstrate a probability of success on the claim." Id. (quoting Starr v. Boudreaux, 978 So. 2d 384, 389 (La. App. 1st Cir. 2007)). The plaintiff must produce "evidence of sufficient quality and quantity to demonstrate that he will be able to meet his burden of proof at trial." Estiverne v. Times-Picayune, L.L.C., 950 So. 2d 858, 860 (La. App. 4th Cir. 2006) (quoting Sassone v. Elder, 626 So. 2d 345, 351 (La. 1993)). This has been described as a difficult burden, justified by the importance of protecting free speech rights. Henry, 566 F.3d at 182 (finding the plaintiff had not met the burden by failing to present an affidavit that showed the fault element of defamation, but remanding to permit the

district court to allow limited discovery).

II.

A. Defamation

To succeed on a defamation claim in Louisiana, the plaintiff must establish "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater on the part of the publisher; and (4) resulting injury." Henry, 566 F.3d at 182 (quoting Kennedy v. Sheriff of East Baton Rouge, 935 So. 2d 669, 674 (La. 2006)). "By definition, a statement is defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community, deter others from associating or dealing with the person, or otherwise expose the person to contempt or ridicule." Kennedy, 935 So. 2d at 675. A statement is defamatory per se if it accuses another of criminal conduct or tends to injure one's reputation without considering extrinsic facts or circumstances. Id. If not defamatory per se, the statement must be susceptible of a defamatory meaning. Id. The parties seem to agree (at least for the purpose of this motion) that the negligence standard applies as the measure of fault of the defendants.[3] In other words, the

---

[3] The Louisiana Supreme Court has held that "the standard of negligence set forth in the Restatement (Second) Of Torts § 580B is to be applied in cases . . . involving a private individual allegedly injured by a defamatory falsehood in a matter of public concern." Kennedy, 935 So.2d at 681 (considering a case of allegedly false statements made by fast food chain employees to law enforcement).

plaintiff must show that, at the least, the defendants acted negligently in failing to ascertain the false and defamatory nature of the statements. See Restatement 2d Torts § 580(B).

## B. False Light

A false light invasion of privacy claim "arises from publicity which unreasonably places the plaintiff in a false light before the public." Perere v. La. Television Broad. Corp., 721 So. 2d 1075, 1078 (La. App. 1st Cir. 1998). While the publicity need not be defamatory, it must "be objectionable to a reasonable person under the circumstances and must contain either falsity or fiction." Id. "The reasonableness of the defendant's conduct is determined by balancing . . . the plaintiff's interest in protecting his privacy from serious invasions, and the defendant' interest in pursuing his course of conduct." Smith v. Ark. La. Gas Co., 645 So. 2d 785 (La. App. 2nd Cir. 1994).

## III.

## A. Connection with a Public Issue

The defendants have the burden of showing that the article was published in furtherance of their free speech rights and in connection with a public issue. The parties do not seem to dispute that the publication of an article in a news magazine can be an act in furtherance of free speech rights, but the plaintiff contends that the actions of Dr. Armington are not a matter of public interest. According to its introduction, the article's purpose in

11

describing and analyzing the events at Memorial Hospital in the days following Hurricane Katrina is to consider questions raised by disasters like how limited resources should be divided amongst patients and what is the line between comfort care and mercy killing. The article asserts the importance of these issues in light of proposed legislation to alter the standard of medical care in emergencies.

The Court finds the article's stated purpose presents an issue of public interest. Old news, yes, but that the article resurrects old news does not diminish the public interest quotient. The article mentions the existence of various triage procedures, some of which do not ration care so as to cause the most ill receive care last. In effect, the article presents a critique of the procedures used in 2005 at Memorial Hospital, and, possibly, the type of procedures that Dr. Pou and others seek to legislatively sanction if used in future emergencies. While the motivation in researching, writing, and publishing the article might seem ghoulish, driven in part to sell a sensational topic like the use of euthanasia in disasters, this does not, alone, cease to make the issue of how doctors have acted in previous emergencies less relevant to the discussion of what standard the public should hold doctors to in future emergencies.

The Article 971 special motion to strike is, therefore, available to the defendants here.

B. Probability of Success

To defeat this special motion to strike, the plaintiff must submit evidence that establishes a probability of success on his defamation and false light claims. The plaintiff enumerates the following examples of defamation:

> 1. The articles' statement that "more medical professions were involved in the decision to inject patients" in the context of an a discussion about several doctors and nurses at Memorial Hospital in the days following Hurricane Katrina, including Dr. Armington.
> 2. In a section about the decision to evacuate those patients with D.N.R. orders last, the articles' statement that "Bill Armington, a neuroradiologist, told me he thought that patients who did not wish their lives to be prolonged by extraordinary measures wouldn't want to be saved at the expense of others – though there was nothing in the orders that stated this. At the time, those attending the meeting didn't see it as a momentous decision, since rescuers were expected to evacuate everyone in the hospital within a few hours."
> 3. The articles' statement that "Bill Armington, the neuroradiologist, watched King go and was upset at him for leaving," following a paragraph describing King as deciding to leave because he did not want to participate in euthanasia.
> 4. The articles' statement that "Armington suspected that euthanasia might occur, in part, he told me, because Cook told him earlier that there had been a discussion of 'things that only doctors talk about.' Armington headed for the helipad, 'stirred up,' as he recalls, 'to intensify my efforts to get people off the roof.'"
> 5. The articles' statement, following the above two statements that "Neither Armington nor King intervened directly, though King had earlier sent out text messages to friends and family asking them to tell the media that doctors were discussing giving medication to dying patients to help accelerate their deaths."

Dr. Armington emphasizes that these statements are false because he did not know or suspect that euthanasia was occurring at the hospital while he was there in the days following Hurricane

13

Katrina. He submits an affidavit attesting to this, and also asserts that he told this to Dr. Fink and the fact checker on numerous occasions. Dr. Fink has submitted an affidavit authenticating what she submits are notes that she took during three telephone interviews with Dr. Armington. Charles Wilson, the fact checker, has submitted an affidavit and the working drafts he used while verifying the statements in the article with Dr. Armington. Both Dr. Fink and Wilson assert that the statements in the article reflect their conversations with Dr. Armington. Dr. Armington's affidavit merely counters that Dr. Fink's notes inaccurately record the interviews, and that when Wilson called to verify statements, Dr. Armington felt he was being pushed to state that he believed euthanasia was occurring while he was at Memorial.[4]

Statement 1 is simply not capable of defamatory meaning. While accusation of criminal conduct is defamatory per se and euthanasia is a crime in Louisiana, the article does not directly accuse Dr. Armington of engaging in euthanasia. The only parts of the article that reference Dr. Armington by name do not rationally lead to an accusation that Dr. Armington is among the unnamed "more medical professionals" involved in euthanasia. Instead, the article mentions another doctor by name as helping Dr. Pou and stating that

---

[4] However, there is no hint that the plaintiff refuted what he felt Wilson was engaged in.

"the goal was death; our goal was to let these people die." It describes a nurse who recounted giving an unconscious woman with labored breathing a syringe of morphine and midazolam, shortly after which the woman died. The article quotes the nurse as stating that "even if it had been euthanasia, it's not something we don't really do every day." It quotes another doctor as telling Dr. Pou how to administer a combination of morphine and a sedative with the effect that patients would "go to sleep and die." Surely a reader would understand those doctors and nurses to be amongst the "more medical professionals" referred to in the article, not Dr. Armington.

Despite conflicting affidavits, it is also clear that statement 2 is not false. Further, Dr. Armington does not dispute the truth of statements 3 and 5. As to statement 4, Armington insists that he did not believe euthanasia was occurring, and only in hindsight did he think that Cook had been talking about euthanasia. The Court notes that statement 4 asserts that Dr. Armington believed euthanasia "might occur," not that he thought it might be occurring.

Further, the Court finds these statements are incapable of defamatory meaning. In the context of the article as a whole (which primarily focuses on other doctors and nurses), Dr. Armington is portrayed as a doctor who, while suspecting euthanasia might occur, renewed his efforts to evacuate all of the patients. The only

15

statements that could possibly be inferred to have a defamatory connotation are the statements that Dr. Armington was upset when Dr. King decided to leave and that Dr. Armington did not intervene directly. These simply do not stand out as being of the nature to harm Dr. Armington's reputation any more than the simple fact that he was working at a hospital at the time that other doctors were, according to the article, involved in euthanasia.

Because the statements seem less than rationally capable of defamatory meaning, Dr. Armington has failed to show a probability of success on his defamation claim. Similarly, Dr. Armington's claim for false light invasion of privacy must fail because he cannot demonstrate a probability of successfully showing that the publicity placed him in a false light. Furthermore, it is not clear Dr. Armington could show a serious invasion of his privacy because he interviewed with Dr. Fink for the purpose of providing his experiences for the article, and while Dr. Armington asserts that he was misled about the focus of the article, the Court finds the article was, as he was told, about the reactions of physicians in a crisis situation. Finally, nothing suggests that permitting discovery would allow Dr. Armington to establish anything that might help him successfully oppose the plaintiff's motion. Accordingly, IT IS ORDERED: that the defendants' special motion to strike is GRANTED.

IT IS FURTHER ORDERED: that the plaintiff's motion to conduct

discovery and motion to continue are DENIED.

IT IS FURTHER ORDERED: that the defendants' be awarded reasonable attorney fees and costs, in accordance with Louisiana Code of Civil Procedure Article 971(C).[5] This issue will be referred to the magistrate judge for resolution.

New Orleans, Louisiana, February 24, 2010.

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

---

[5] The Court is acutely aware of the grief Hurricane Katrina visited upon everyone at Memorial in the summer of 2005, and the ugly accusations that provoked a storm of difficult rhetoric and recriminations. But this Court believes Justice ought not be bullied by tragic stories; it must be impartial at all costs. The *Times* piece selfishly resurrects melodrama to an old and sad story. But it cannot be said it defames Dr. Armington.